# EXHIBIT B




**PAYARC LLC**
**TERMS AND CONDITIONS**

This Agreement is entered into between the merchant ("Merchant") who is identified on the signed the Merchant Processing Application ("Application"), Evolve Bank and Trust, an Arkansas state chartered bank ("EB&T" or "Bank"), and PayArc, LLC, a Connecticut limited liability company ("ISO").  ISO and Bank may be collectively referred to as the "Settlor." Subject to the requirements of applicable Card Association rules, ISO and Bank may and hereby do allocate Settlor's duties and obligations as they, in their sole and exclusive discretion, deem appropriate. ISO and Bank may jointly or individually assert or exercise any right(s) or remedies provided to Settlor under this Agreement.

## ARTICLE I – DEFINITIONS

1.1 "**Account**" means a commercial checking or demand depo

1.2 sit account maintained by Merchant referred to in Section 5.17 for the crediting of collected funds and the debiting of fees and charges under this Agreement.

1.3 "**ACH**" means the Automated Clearing House paperless entry system controlled by the Federal Reserve Board.

1.4 "**Agreement**" means the Application, these terms and conditions, any supplementary documents referenced herein, and valid schedules and amendments to the foregoing.

1.5 "**Authorization**" means a computerized function or a direct phone call to a designated number to examine individual Transactions to obtain approval from the Card Issuer to charge the Card for the amount of the sale.

1.6 "**Card**" means (i) a valid credit card in the form issued under license from Visa U.S.A., Inc., Visa International, Inc., MasterCard International, Inc., or Discover® ("Bank Card"); or (ii) any other valid credit card accepted by Merchant by agreement with Bank.

1.7 "**Card Association**" means Visa U.S.A., Inc., Visa International, Inc., MasterCard International, Inc., Discover, or any other Card Issuers that provide Cards accepted by Merchant by agreement with Bank.

1.8 "**Card Issuer**" means the financial institution or company which has provided a Card to a Cardholder.

1.9 "**Card Not Present (CNP)**" means that an Imprint of the Card is not obtained at the point-of-sale.

1.10 "**Cardholder**" means the person whose name is embossed upon the face of the Card.

1.11 "**Cardholder Information**" means any non-public, sensitive information about a Cardholder, including any combination of Cardholder name plus the Cardholder's social security number, driver's license or other identification number or credit or debit card number, or other bank account number.

1.12 "**Chargeback**" means the procedure by which a Sales Draft (or disputed portion thereof) is returned to Bank by a Card Issuer because such item does not comply with the applicable Card plan's operating regulations.

1.13 "**Company**" or "**Merchant**" means the business entity or sole proprietor that has authorized this Agreement to be signed and is fully responsible for abiding by all provisions of the Agreement as now written or as may be modified in the future.

1.14 "**Credit Voucher**" means a document executed by a Merchant evidencing any refund or price adjustment relating to Cards to be credited to a Cardholder account.

1.15 "**Imprint**" means (i) an impression on a Sales Draft manually obtained from a Card through the use of an imprinter, or (ii) the electronic equivalent obtained by swiping a Card through a terminal and electronically capturing Card Data and printing a Sales Draft.

1.16 "**ISO**" means PayArc LLC, the Independent Sales Organization or Member Service Provider sponsored by Evolve Bank and Trust and providing limited services to the Bank and on behalf of the Bank to Merchant and which is a party to this Agreement as specified.

1.17 "**Mid- or Non-Qualifying Transaction**" means any sale Transaction that fails to qualify for lowest interchange rate assigned by the applicable Card Association for Merchant's standard card industry code and which may be charged fees as set forth in Schedule A.

1.18 "**Officer**" means the person or persons duly authorized by the Company to sign the Application and obligate the Company to fully abide by all provisions of the Agreement as now written or as modified in the future.

1.19 "**Sales Draft**" means the paper form, whether electronically or manually imprinted, evidencing a sale Transaction.

1.20 "**Transaction**" means any sale of products or services, or credit for such, from a Merchant for which the Cardholder makes payment through the use of any Card and which is presented to Bank for collection.

1.21 "**Voice Authorization**" means a direct phone call to a designated number to obtain credit approval on a Transaction from the Card Issuer, whether by voice or voice-activated systems.

## ARTICLE II – CARD ACCEPTANCE

2.1 <u>Honoring Cards</u>. Merchant will accept all valid Cards when properly presented by Cardholders in payment for goods or services, subject to applicable Card Association rules requiring Merchant to elect whether it will accept credit only, debit only or both debit and credit Cards. Merchant's election is set forth in the Application. Merchant may not establish minimum or maximum amounts for Card sales as a condition for accepting any Card. Merchant may not require any Cardholder to pay as a surcharge any part of any discount or charge imposed upon Merchant by this Agreement, whether through any increase in price or otherwise require a Cardholder to pay any charge or price as a condition of sale that is not also required from a customer paying cash. However, Merchant may not, by




**PAYARC LLC**
**TERMS AND CONDITIONS**

this term, be prevented from offering discounts to Cardholders for cash purchases. Merchant may not engage in a Transaction (other than a mail, Internet, telephone order, or preauthorized sale to the extent permitted under this Agreement) if the person seeking to charge the purchase to his or her Card account does not present the Card to permit Merchant to compare the signature on the Card to the signature on the Sales Draft and obtain an Imprint or otherwise use the physical Card to complete the Transaction.

2.2   <u>Advertising</u>. Merchant will prominently display the promotional materials provided by Settlor in its place(s) of business. Merchant's use of promotional materials and use of any trade name, trademark, service mark or logo type ("Marks") associated with a Card is limited to informing the public that the Card will be accepted at Merchant's place(s) of business. Merchant's use of promotional materials and Marks is subject to Settlor's direction. Merchant may use promotional materials and Marks only during the term of this Agreement and will immediately cease use and return any inventory to Settlor upon termination thereof. Merchant may not use any promotional materials or Marks associated with Visa, MasterCard, or Discover in any way which suggests or implies that either endorses any goods or services other than Bank Card services.

2.3   <u>Card Acceptance</u>. When accepting a Card, Merchant will follow the steps provided by Settlor for accepting Cards and will: (a) Determine in good faith and to the best of its ability that the Card is valid on its face; (b) obtain Authorization from the Card Issuer to charge the Cardholder's account; (c) unless the Sales Draft is electronically generated or is the result of a mail, Internet, phone or preauthorized order, (i) obtain an Imprint of the Card including embossed data from the merchant imprinter plate; and (ii) obtain the Cardholder's signature on the Sales Draft and compare that signature to the signature on the Card; (d) enter a description of the goods or services sold and the price thereof (including any applicable taxes); (e) deliver a true and completed copy of the Sales Draft to the Cardholder at the time the goods are delivered or services performed, or, if the Sales Draft is prepared by a point-of-sale terminal, at the time of the sale; (f) offer the Sales Draft to Settlor for purchase according to Settlor's procedures and the terms of this Agreement; and (g) make a Card Imprint, if the Transaction is not based upon a mail, Internet, phone or pre-authorized order.

2.4   <u>Authorization</u>. Merchant will obtain an Authorization for all Card sales. If Merchant cannot, for any reason, obtain an electronic Authorization through the use of a terminal, Merchant will request a Voice Authorization from Settlor's designated authorization center and will legibly print the authorization number on the Sales Draft. Merchant will not obtain or attempt to obtain authorization from Settlor's authorization center unless Merchant intends to submit to Settlor a Transaction for the authorized amount if Authorization for the Transaction is given. Merchant may not divide a single Transaction between two or more Sales Drafts on a single Card to avoid Authorization limits that may be set by the Card Issuer. Merchant acknowledges that an Authorization provides only that the Cardholder account has sufficient credit available to cover the amount of the current sale and that an Authorization is not a guarantee that the Transaction will not be subject to dispute or Chargeback and does not warranty the Cardholder's identity. Merchant may not attempt to obtain an authorization by successively decreasing the sale amount. Settlor may refuse to purchase or process any Sales Draft presented by Merchant: (a) unless a proper authorization or approval code has been recorded on the Sales Draft; (b) if Settlor determines that the Sales Draft is or is likely to become uncollectible from the Cardholder to which the transaction would otherwise be charged; (c) if Settlor has reason to believe that the Sales Draft was prepared in violation of any provision of this Agreement; or (d) if Merchant submits any travel and entertainment card ("T&E) transaction for processing by Settlor without a valid agreement with the respective T&E Card company, such as American Express. For the T&E Card transactions designated on Schedule A, upon transmission of such Sales Data by Merchant, Settlor will forward the Sales Data to the appropriate T&E Card company on Merchant's behalf. Payment of the proceeds due Merchant will be governed by whatever agreement Merchant has with that T&E Card company, and neither ISO nor the Bank bears any responsibility for the performance of the T&E card company nor is responsible for providing support to the Merchant for such services. If Merchant's agreement with a T&E Card company requires the T&E Card company's consent for the Settlor to perform the limited processing services contemplated by this Agreement, Merchant is responsible for obtaining that consent Merchant will use, and may not circumvent, fraud identification tools requested by Settlor, including Address Verification System processing and CVV2 processing, and acknowledges that the use of these tools may prevent Merchant from accepting certain Cards as payment. Merchant acknowledges that its use of fraud identification tools may not prevent fraudulent Card usage, and agrees that any fraudulent Transaction may ultimately result in a Chargeback, for which Merchant retains full liability under this Agreement.

2.5   <u>Retention and Retrieval of Cards</u>. Merchant will use its best efforts, by reasonable and peaceful means, to retain or recover a Card when receiving such instructions when making a request for Authorization or if Merchant has reasonable grounds to believe the Card is counterfeit, fraudulent or stolen. Merchant's obligations under this section do not authorize a breach of the peace or any injury to persons or property, and Merchant will hold ISO and Bank harmless from any claim arising from any injury to person or property or other breach of the peace in connection with the retention or recovery of a Card.

2.6   <u>Multiple Transaction Records; Partial Consideration</u>. Merchant may not prepare more than one Sales Draft for a single sale or for a single item but will include all items of goods and services purchased in a single Transaction in the total amount on a single Sales Draft except under the following circumstances: (a) for purchases in separate departments of a multiple department store; (b) for partial payment, installment payment, delayed delivery, or advance deposit; or (c) for delayed or amended charges governed by rules for travel and entertainment merchants and Transactions.

2.7   <u>Telephone Orders, Mail Orders, Internet, Preauthorized Orders and Installment Orders</u>. Unless Merchant has been approved by Settlor to accept mail, Internet or telephone orders, Merchant warrants that it is a walk-in trade business, located in a retail business place where the public moves in and out freely in order to purchase




**PAYARC LLC**
**TERMS AND CONDITIONS**

merchandise or obtain services. If Settlor determines Merchant has accepted unapproved Card Transactions which are placed by telephone, generated through telephone solicitation, mail order or other means that does not create a Sales Draft that bears the Card imprint and Cardholder's signature, this Agreement will be immediately terminated and the value of all Sales Drafts collected from the first day of processing may be charged back to Merchant and all funds therefrom held as provided in Article IV. Unless approved by Bank, this Agreement does not contemplate regular acceptance of Cards for sales accepted by mail, Internet or telephone nor through preauthorized orders. If an occasional Card Transaction is made by mail, phone or preauthorized order, the Sales Draft may be completed without the Cardholder's signature or an Imprint, but in such case Merchant will create a sales slip containing Cardholder data, an Authorization number, the sale amount and the letters "MO", "TO" or "PO", as appropriate. Receiving an Authorization will not relieve the Merchant of liability for Chargeback on any Transaction for which the Merchant did not obtain an Imprint or the Cardholder's signature.

2.8  <u>Lodging and Vehicle Rental Transactions</u>. Merchant must estimate and obtain Authorization for the amount of the Transaction based upon the Cardholder's intended length of stay or rental. Additional Authorization must be obtained and recorded for charges actually incurred in excess of the estimated amount. Regardless of the terms and conditions of any written preauthorization form, the Sales Draft amount for any lodging or vehicle rental Transaction must include only that portion of the sale, including any applicable taxes, evidencing a bona fide rental of real or personal property by Merchant to the Cardholder and may not include any consequential charges. Nothing contained herein is intended to restrict Merchant from enforcing the terms and conditions of its preauthorization form through means other than a Card Transaction.

2.9  <u>Returns and Adjustments; Credit Vouchers</u>. Merchant's policy for the exchange or return of goods sold and the adjustment for services rendered will be established and posted in accordance with operating regulations of the applicable Card Association's regulations. Merchant will disclose, if applicable, to a Cardholder before a Card sale is made, that if merchandise is returned: (a) no refund, or less than a full refund, will be given; (b) returned merchandise will only be exchanged for similar merchandise of comparable value; (c) only a credit toward purchases will be given; or (d) special conditions or circumstances apply to the sale (e.g., late delivery, delivery charges, or other non-credit terms). If Merchant does not make these disclosures, a full refund in the form of a credit to the Cardholder's Card account must be given. Disclosures must be made on all copies of Sales Drafts or invoices in letters approximately 1/4" high in close proximity to the space provided for the Cardholder's signature or on an invoice issued at the time of the sale or on an invoice being presented for the Cardholder's signature. Any change in Merchant's return or cancellation policy must be submitted in writing to Bank not less than 14 days prior to the change. Settlor may refuse to process any Sales Draft made subject to a revised return or cancellation policy of which Settlor has not been notified as required herein.

2.10  <u>Cash Payments</u>. Merchant may not receive any payments from a Cardholder for charges included in any Transaction resulting from the use of any Card nor receive any payment from a Cardholder to prepare and present a Transaction for the purpose of affecting a deposit to the Cardholder's Card account.

2.11  <u>Cash Advances; Scrip Purchases</u>. Merchant may not deposit any Transaction for the purpose of obtaining or providing a cash advance either on Merchant's Card or the Card of any other party and may not accept any Card at a scrip terminal, and either action will be grounds for Settlor's immediate termination of this Agreement.

2.12  <u>Duplicate Transactions</u>. Merchant may not deposit duplicate Transactions. Settlor may debit Merchant for any adjustments for duplicate Transactions and Merchant is liable for any Chargebacks resulting therefrom.

2.13  <u>Deposit of Fraudulent Transactions</u>. Merchant may not accept or deposit any fraudulent Transaction and may not under any circumstances present for processing or credit, directly or indirectly, a Transaction which originated with any other merchant or any other source other than Transactions arising from bona fide purchases from Merchant for the goods and services for which Merchant has been approved under this Agreement. If Merchant deposits any prohibited Transaction, Settlor may: (a) immediately terminate this Agreement; (b) withhold funds and demand an escrow as provided in this Agreement; (c) report Merchant to Visa, MasterCard, and Discover under Section 4.4. Merchant's employees' actions are chargeable to Merchant under this Agreement.

2.14  <u>Collection of Pre-existing Debt</u>. Merchant may not prepare and present to Settlor for purchase any Transaction representing the refinancing of an existing Cardholder obligation including, but not limited to, obligations: (a) previously owed to Merchant; (b) arising from the dishonor of a Cardholder's personal check or relating to a Chargeback; or (c) representing the collection of any other pre-existing indebtedness, including collection of delinquent accounts on behalf of third parties.

2.15  <u>Data Security/Personal Cardholder Information</u>. Merchant may not, as a condition of sale, impose a requirement on Cardholders to provide any personal information as a condition for honoring Cards unless such information is required to provide delivery of goods or services or Merchant has reason to believe the identity of the person presenting the Card may be different from that of the Cardholder. Merchant will not, under any circumstances, release, sell or otherwise disclose any Cardholder Information to any person other than Settlor or the applicable Card Association, except as expressly authorized in writing by the Cardholder, or as required by law. PayArc acknowledges that while cardholder information is in its possession it is responsible for the security of such cardholder data and any ensuing storage, processing or transmitting activity on behalf of the customer and would, to that extent only, be responsible for and store and secure such cardholder information under normal industry standards.

(a)  <u>Safeguards</u>. Merchant will maintain appropriate administrative, technical and physical safeguards for all Cardholder Information. These safeguards will (i) ensure the confidentiality of Cardholder Information; (ii) protect against any anticipated threats or hazards to the security or integrity of Cardholder Information; (iii) protect




**PAYARC LLC**
**TERMS AND CONDITIONS**

against unauthorized access to or use of Cardholder Information that could result in substantial harm or inconvenience to any Cardholder; and (iv) properly dispose of all Cardholder Information to ensure no unauthorized access to Cardholder Information. Merchant will maintain all such safeguards applicable to Merchant, ISO, or Bank in accordance with applicable federal and state laws, rules, regulations and guidance.

(b) <u>Compliance with Card Association Rules</u>. Merchant represents, warrants and covenants that it is and will remain throughout the term of this Agreement in compliance with Card Association bylaws, operating regulations and rules related to data security, data integrity and the safeguarding of Cardholder Information including the Payment Card Industry Data Security Standard ("PCI"), MasterCard's Site Data Protection Program ("SDP"), Visa's Customer Information Security Program ("CISP"), and Discover Information Security Compliance ("DISC"), , in effect and as may be amended, supplemented or replaced. Merchant will cause all of its service providers, subcontractors and agents to comply with PCI, SDP and CISP requirements at all times. Merchant will report any non-compliance immediately to Bank. To accomplish the foregoing, Merchant will encrypt all debit, credit or stored value card numbers whether in storage, transport or backup and will not store data security codes on its systems, network or software. Provide the acquirer with information on any service providers the merchant uses or intends to use The ISO may not subcontract, sublicense, assign, license, franchise, or any manner extend or transfer to any third party, any right or obligation of the ISO set forth in the Merchant Agreement. The Bank may not waive, forgive, release, assign, or fail to insist on strict performance of each requirement.

(c) <u>Annual Certification</u>. Merchant will provide an annual certification to Settlor if requested by Settlor (in a form acceptable to Bank) certifying compliance with the data security provisions of this Agreement, including compliance with applicable Card Association requirements such as PCI, SDP and CISP. Merchant will provide annual certifications for Merchant's service providers, subcontractors and agents.

(d) <u>Information Use Limitations</u>. Merchant may not sell, disclose, or otherwise make Cardholder Information available, in whole or in part, in a manner not provided for in this Agreement, without Bank's prior written consent. Merchant may, however, disclose Cardholder Information to its service providers, subcontractors and agents who have a need to know such information to provide the Services described in this Agreement, provided that those individuals or entities have assumed confidentiality obligations in accordance with this Agreement, or as may be required by legal process or applicable federal and state laws, rules, regulations and guidance and have entered into a written agreement with Merchant containing Merchant's and such individuals' or entities' agreement to the foregoing data security provisions including compliance with Card Association rules, regulations or bylaws.

(e) <u>Response to Unauthorized Access</u>. Merchant will notify Bank within 24 hours after it knows of any breach in security resulting in an unauthorized access to Cardholder Information. Merchant will provide any assistance that Settlor, the issuing bank of any Cardholder, and their regulators and the Card Associations deem necessary to contain and control the incident to prevent further unauthorized access to or use of Cardholder Information. Such assistance may include, but not be limited to, preserving records and other evidence and compiling information to enable Settlor and the issuing bank(s) or the Card Associations to investigate the incident and provide assistance and cooperation to: (i) file suspicious activity reports (as applicable); (ii) notify their regulators (as applicable); and (iii) notify the affected Cardholder (as required). Unless the unauthorized access was due to Settlor's acts or omissions, Merchant will bear the cost of notifying affected Cardholder.

(f) <u>Forensic Investigation</u>. The merchant, if undergoing a forensic investigation, must fully cooperate with the investigation until completed.

(g) <u>Miscellaneous</u>. Merchant may not make a claim against Bank or ISO or hold Bank or ISO liable for the acts or omissions of other merchants, service providers, Card Associations, financial institutions or others that do not have a written contractual relationship with Bank and/or ISO or over which Bank and/or ISO have no control. These provisions supplement, augment and are in addition to obligations of indemnification, audit, confidentiality and other similar provisions contained in this Agreement. This Section 2.15 and each of its subsections will survive this Agreement's termination. Merchant may not store in any system or in any manner discretionary Card read data including without limitation CVV2 data, PIN data, address verification data or any other information prohibited by Card Association rules.

(h) <u>International Airline Merchants</u>. For International Airline Program participants and Multinational Merchant Acceptance Program participants, both must comply with Visa Core Rules, specifically section 5.2.1.8 of the Visa Core Rules (https://usa.visa.com/dam/VCOM/download/about-visa/visa-rules-public.pdf)

2.16 <u>Compliance with Card Association Rules</u>. Merchant will comply with and conduct its Card activities in accordance with all applicable Card Association rules and regulations. Failure to comply with such rules and regulations may result in Merchant being terminated for cause and listed on various Card Association and industry databases, including the Terminated Merchant File and the Merchant Alert to Control High Risk Merchants file ("MATCH"). With respect to MasterCard, Visa USA, or Discover, Merchant may not: (a) accept Cardholder payments for previous Card charges incurred at the Merchant location; (b) establish a minimum or maximum transaction amount as a condition for honoring a Card; (c) require a Cardholder to complete a postcard or similar device that includes the Cardholder's account number, card expiration date, signature, or any other card account data in plain view when mailed; (d) add any surcharge to transactions; (e) add any tax to transactions, unless applicable law expressly requires that Merchant be permitted to impose a tax (any tax amount, if allowed, must be included in the transaction amount and not collected separately); (f) enter into interchange any transaction receipt for a transaction that was previously charged back to Settlor and subsequently returned to Merchant, irrespective of Cardholder approval (Merchant may pursue payment from the Cardholder outside the Card Association system); (g) request or use an account number for any purpose other than as payment for its goods or services; (h)




**PAYARC LLC**
**TERMS AND CONDITIONS**

disburse funds in the form of travelers checks, if the sole purpose is to allow the Cardholder to make a cash purchase of goods or services from Merchant; (i) disburse funds in the form of cash, unless: (i) Merchant is a lodging or cruise line merchant disbursing cash to a Cardholder, (ii) Merchant is dispensing funds in the form of travelers checks, Cards, or foreign currency, or (iii) Merchant is participating in the Card Association cash back service; (j) accept a Card for the purchase of scrip; (k) accept a Card for manual cash disbursement; (l) accept a Card to collect or refinance existing debt that has been deemed uncollectible by the Merchant providing the associated goods or services; (m) enter into a Transaction that represents collection of a dishonored check; (n) accept a Card for an unlawful Internet gambling transaction. Merchant will pay all Card Association fines, fees, penalties and all other assessments or indebtedness levied by Card Associations to Bank which are attributable, at Settlor's discretion, to Merchant's Transaction processing or business; (o) submit a transaction into the payment system that is illegal or that the merchant knows or should have known was illegal. Transactions must be legal in both the cardholders and merchant's jurisdiction; (p) submit a transaction into the payment system that the merchant knows or should have known to be fraudulent or not authorized by the cardholder.

2.17   <u>Merchant's Business</u>. Merchant will notify Bank immediately if it intends to (a) transfer or sell any substantial part of its total assets, or liquidate; (b) change the basic nature of its business, including selling any products or services not related to its current business; (c) change ownership or transfer control of its business; (d) enter into any joint venture, partnership or similar business arrangement whereby any person or entity not a party to this Agreement assumes any interest in Merchant's business; (e) alter in any way Merchant's approved monthly volume, average, or maximum ticket; or (f) change its return policies or to use another fulfillment house different from those identified in Merchant Application. Merchant will notify Bank promptly in writing if it becomes subject to any voluntary or involuntary bankruptcy or insolvency petition or proceeding. Merchant's failure to provide notice as required above may be deemed a material breach and will be sufficient grounds for termination of Merchant and for Settlor's exercise of all its rights and remedies provided by this Agreement. If any change listed above occurs, Settlor may immediately terminate this Agreement.

2.18   <u>Merchant's Warranties</u>. Merchant represents and covenants that: (a) all information contained in the Application or any other documents delivered to Bank or ISO in connection therewith is true and complete and properly reflects Merchant's business, financial condition and principal partners, owners or officers; (b) Merchant has power to execute, deliver and perform this Agreement, and this Agreement is duly authorized, and will not violate any provisions of law, or conflict with any other agreement to which Merchant is subject; (c) Merchant holds all licenses, if any, required to conduct its business and is qualified to do business in every jurisdiction where it is required to do so; (d) there is no action, suit or proceeding at law or in equity now pending or to Merchant's knowledge, threatened by or against or affecting Merchant which would substantially impair its right to carry on its business as now conducted or adversely affect its financial condition or operations; (e) each Sales Draft presented to Bank for collection is genuine and is not the result of any fraudulent or prohibited Transaction or is not being deposited on behalf of any business other than Merchant as authorized by this Agreement; (f) each Sales Draft is the result of a bona fide Card Transaction for the purchase of goods or services from Merchant by the Cardholder in the total amount stated on the Sales Draft; (g) Merchant has performed or will perform all of its obligations to the Cardholder in connection with the Card Transaction evidenced thereby; (h) Merchant has complied with Settlor's procedures for accepting Cards, and the Card Transaction itself does not involve any element of credit for any other purposes other than as set forth in this Agreement, and is not subject to any defense, dispute, offset or counterclaim which may be raised by any Cardholder under the Card Associations' rules, the Consumer Credit Protection Act (15 USC §1601) or other relevant state or federal statutes or regulations; and (i) any Credit Voucher which it issues represents a bona fide refund or adjustment on a Card sale by Merchant with respect to which a Sales Draft has been accepted by Bank.

### ARTICLE III – PRESENTMENT, PAYMENT, CHARGEBACK

3.1   <u>Acceptance</u>. Settlor will accept from Merchant all Sales Drafts deposited by Merchant under the terms of this Agreement and will present the same to the appropriate Card Issuers for collection against Cardholder accounts. Merchant must transmit Sales Drafts and Credit Vouchers to Bank or its processing vendor on the same or next business day immediately following the day that such Sales Drafts and Credit Vouchers have been originated. All presentment and assignment of Sales Drafts, collection thereof and reassignment or rejection of such Sales Drafts are subject to the terms of this Agreement and regulations of the Card Association. Settlor will only provisionally credit the value of collected Sales Drafts to Merchant's Account and reserves the right to adjust amounts collected to reflect the value of Chargebacks (actual and anticipated), fees, penalties, late submission charges, reserve deposits, negative Sales Draft batch deposits and items for which Bank did not receive final payment.

3.2   <u>Endorsement</u>. By presenting Sales Drafts to Settlor for collection and payment, Merchant agrees to sell and assign all its right, title and interest in each Sales Draft completed in conformity with Settlor's acceptance procedures and constitutes an endorsement by Merchant to Settlor of such Sales Drafts. Settlor may supply such endorsement on Merchant's behalf.

3.3   <u>Prohibited Payments</u>. Settlor may receive payment of any Sales Draft presented by Merchant and paid by Settlor unless and until there is a Chargeback. Unless specifically authorized in writing by Bank, Merchant may not collect or attempt to collect any Sales Draft, including Chargebacks, and will hold in trust for Settlor and promptly deliver in kind to Settlor any payment Merchant receives, in whole or in part, of the amount of any accepted Transaction, together with the Cardholder's name and account number and any correspondence accompanying payment.

   3.4   <u>Chargebacks</u>. Merchant will accept for chargeback any sale for which the Cardholder disputes the validity of the sale according to prevailing Card Association regulations, or a Card issuer or Settlor determines that




**PAYARC LLC**
**TERMS AND CONDITIONS**

Merchant has in any way failed to comply with Card Association regulations or Settlor's procedures in accepting a Card and presenting the resulting Sales Draft to Settlor for purchase. Section 2.3 notwithstanding, Settlor may charge back the amount of a Card sale for which the Cardholder disputes authorizing the charge if Merchant failed to obtain the Card Imprint or the Cardholder's signature. Merchant may not initiate a sale Transaction in an attempt to collect a Chargeback. Merchant will pay the current published fees for each Chargeback as listed on Schedule A. Settlor will send Merchant any requests received from Issuing Banks or the Associations resulting from Merchant's transactions ("Retrieval Request") if the Settlor cannot satisfy the inquiry with the information retained by Settlor concerning any Card sale. In response to the Retrieval Request Merchant must provide by certified or overnight mail or by confirmed fax or scanned documents (or by other means as agreed by Bank) the results of Merchant's investigation of such Retrieval Requests and include legible copies of any documentation required by the Retrieval Request within seven (7) business days after the Settlor dispatched the Retrieval Request to Merchant (or such shorter time as the Card Association rules may require and of which Merchant will be notified). Merchant acknowledges that failure to fulfill a Retrieval Request in accordance with Card Association rules may result in an irreversible Chargeback. Merchant has full liability if any Sales Data for which Settlor has given Merchant's Operating Account (as defined below) provisional credit is the subject of a chargeback. Merchant may be allowed to resubmit applicable sales data for a second presentation of a response to a chargeback in accordance with the Card Association rules. To the extent that Settlor has paid or may be called upon to pay a Chargeback or refund/adjustment for or on the account of a Cardholder and Merchant does not reimburse Settlor as provided in this Agreement, then for the purpose of Settlor obtaining reimbursement of such sums paid or anticipated to be paid, Bank and ISO have all of the rights and remedies of such Cardholder under applicable federal, provincial or local law and Merchant authorizes Settlor to assert any and all such claims in Bank and/or ISO's own name for and on behalf of any such Cardholder customer individually or all such Cardholder customers as a class.

3.5   <u>Chargeback Reserve Account</u>. Notwithstanding anything to the contrary in this Agreement, Settlor may establish (without notice to Merchant) and Merchant agrees to fund a non-interest bearing chargeback reserve account (the "Reserve Account"), or demand other security or raise any discount, transaction or other fees. This account may be established at any time or for any reason if, in Settlor's reasonable consideration, Settlor suspects Merchant's transaction processing history is or perhaps will create liabilities for refunds, chargeback reimbursements or Card Association fines that will be owed to Settlor by Merchant and the Settlor determines, in its sole but reasonable consideration, such obligations may not be collectible from Merchant in a timely manner without such Reserve Account being established or the amounts within the Reserve Account increased. Specific examples of conditions that might prompt the Settlor to establish or increase the balances in a Chargeback Reserve Account might include, but will not be limited to: (a) Merchant engaging in any charge processing that creates an overcharge to a Cardholder by duplicating charges; (b) Merchant engaging in any activity designed by Merchant to circumvent a "call center" message when attempting to process a transaction; (c) Merchant breaching this Agreement, violating any representation, covenant or warranty herein, or violating any applicable Card Association rule or applicable law; (d) Merchant's Application is in any way inaccurate or becomes inaccurate subsequent to Settlor's approval of the Application; (e) Merchant changes its type of business without Bank's prior written approval; (f) fraud, Merchant processes an unauthorized charge, or other action that violates Bank's applicable risk management standards or is likely to cause a loss; (g) Merchant has Chargebacks exceeding a percentage of total transactions, total settlement amounts that could exceed the limits for chargeback or fraud transactions permitted by the Card Associations or as such limits as are established by Settlor in any period (h) creating an excessive numbers of requests from consumers or card issuing banks to retrieve documentation; (i) Merchant's financial stability is in question or Merchant ceases doing business; or (j) Merchant terminating this Agreement for any reason. Once the Reserve Account is established, collected funds will be placed in the Reserve Account. Before releasing funds after this Agreement is terminated, Merchant will pay any equipment cancellation fees and any outstanding charges, losses or amounts, and Chargebacks for which Merchant has provided indemnification under this Agreement. Further, Settlor may require Merchant to deposit additional amounts based upon Merchant's processing history and/or anticipated risk of loss to Settlor into the Reserve Account. Once established, unless Bank determines otherwise at its sole discretion, the Reserve Account will remain in place for 180 days and a reasonable period thereafter during which Cardholder disputes may remain valid under applicable Card Association rules. The provisions of this Agreement relating to account debits and credits apply to the Reserve Account and survive this Agreement's termination until Bank terminates the Reserve Account. Any balance remaining after chargeback rights have expired and all of Settlor's other expenses, losses and damages have been paid will be disbursed to Merchant.

### ARTICLE IV – TERMINATION AND EFFECT OF TERMINATION

4.1   <u>Term</u>. This Agreement will be effective once Bank and ISO accept it and, unless otherwise terminated, will continue for three years with automatic two-year renewals thereafter until Merchant provides written notice of non-renewal given not less than 30 days before the end of the then-current term.

4.2   <u>Termination</u>.

(a) <u>Without Cause</u>. Settlor or Card Associations may terminate this Agreement, without cause, upon 30 days advance written notice to Merchant.

(b) <u>For Cause</u>. Settlor or Card Associations may terminate this Agreement in its sole discretion, effective immediately, upon written or verbal notice, or by closing Merchant's point-of-sale terminal, if Settlor or Card Associations reasonably determines that any of the following conditions exists: (i) Merchant has violated any provision of this Agreement; (ii) there is a material adverse change in Merchant's financial condition; (iii) if any case or proceeding is commenced by or against Merchant under any federal or state law dealing with insolvency,

 
bankruptcy, receivership or other debt relief; (iv) any information which Merchant provided to Settlor, including if Application information, was false, incomplete or misleading when received; (v) at any time during the term of this Agreement, Merchant has had a monthly ratio of Chargebacks to total transactions or dollar value exceeding Card Association or Settlor requirements; (vi) an overdraft in the settlement account exists for more than three days; (vii) Merchant or any of Merchant's officers or employees has been involved in processing transactions arising from fraudulent or otherwise unauthorized transactions; (viii) Merchant is or will be unable or unwilling to perform its obligations under this Agreement or applicable law; (ix) Merchant has failed to pay Settlor in a timely manner any amount due; (x) Merchant has failed to promptly perform or discharge any obligation under its settlement account or the Reserve Account; (xi) any of Merchant's representations or warranties made in connection with this Agreement was not true or accurate when given; (xii) Merchant has defaulted on any agreement it has with the Bank or ISO; (xiii) Bank or ISO is served with legal process seeking to attach or garnish any of Merchant's funds or property in Bank's possession, and Merchant does not satisfy or appeal the legal process within 15 days of such service; (xiv) any Card Association rules are amended in any way so that the continued existence of this Agreement would cause Bank or ISO to be in breach of those rules; (xv) any guaranty supporting Merchant's obligations is revoked, withdrawn, terminated or altered in any way; (xvi) any circumstances arise regarding Merchant or its business that create harm or loss of goodwill to any Card Association; (xvii) termination is necessary to prevent loss to Bank, ISO or Card Issuers; (xviii) Merchant's type of business indicated on the Application or as conducted by Merchant could endanger the Bank's safety or soundness; (xix) Merchant's owner, officer, guarantor, or corporate entity has a separate relationship with the Bank and that relationship is terminated; (xx) Merchant appears on any Card Association's security reporting; or (xxi) Settlor's security for repayment becomes impaired. If a notice of Merchant's intent to discontinue using Bank's services is received from Merchant by Bank prior to 30 days before the end of the then-current Term of the Agreement, or if Merchant ceases normal processing activity (defined as the average processing for the previous 6 month period) or the Merchant enters an Agreement with another processor during the initial or additional terms of this Agreement, such circumstances will be material breaches of this Agreement ("Early Termination") and the Merchant will be subject to the relevant provisions of Section 4.4, below.

4.3   <u>Effect of Bankruptcy</u>. Any account or security held by Bank or ISO will not be subject to any preference, claim or stay by reason of bankruptcy or similar law. The parties expressly agree that the acquisition of Card Transactions hereunder is a financial accommodation and if Merchant becomes a debtor in any bankruptcy or similar proceeding, this Agreement may not be assumed or enforced by any other person and Settlor will be excused from performance hereunder.

4.4   <u>Effect of Termination</u>. When termination becomes effective, the parties' rights and obligations existing under this Agreement survive. If this Agreement is terminated, regardless of cause, Settlor may withhold and discontinue the disbursement for all Cards and other Merchant Transactions in the process of being collected and deposited. If Merchant is terminated for cause, Merchant acknowledges that Bank may be required to report Merchant's business name and the names and other identification of its principals to the MATCH file (or it's card brand equivalent) maintained by Visa, MasterCard, and Discover. Merchant expressly agrees and consents to such reporting if Merchant is terminated for any reason requiring listing on the MATCH file. Merchant waives and will hold harmless Settlor from any claims that Merchant may raise as a result of Bank's MATCH file reporting. Merchant will also immediately cease requesting Authorizations. If Merchant obtains any Authorization after termination, the fact that any Authorization was requested or obtained will not reinstate this Agreement. Further, Merchant will return all of Bank's and ISO's property, forms, or equipment. All obligations for Transactions prior to termination (including paying for Chargebacks and Settlor's expenses relating to Chargebacks) survive termination. Neither Bank nor ISO is liable to Merchant for damages (including prospective sales or profits) due to termination. Following termination, Merchant will upon request provide Bank with all original and electronic copies of Sales Drafts and Credit Vouchers that have been retained by Merchant as of the date of termination. Upon termination, any amounts due to Settlor will accelerate and be immediately due and payable, without any notice, declaration or other act whatsoever by Bank or ISO. In consideration for the special terms offered Merchant, the Settlor's cost of initiating and administering the Merchant's processing privileges and for other good and valuable consideration which hereby is acknowledged by Merchant, the parties agree that if this Agreement is terminated before completion of the initial term of this Agreement for any reason other than material uncured breach by Settlor, Merchant hereby agrees Settlor may debit Merchant's Account for liquidated damages ("Cancellation Fees") for Early Termination and de-conversion of the Merchant's processing services by Merchant. Upon any Early Termination, Merchant agrees to return all POS processing equipment in a complete and entirely undamaged condition and in the original packaging, within 7 business days following the date of Termination or ceasing transaction processing and agrees to pay a shipping and restocking charge of no less than $200 to Settlor. If all POS equipment is not returned within the time allowed, ISO and Bank will be entitled to debit the Merchant's Account for the full cost of all equipment when the equipment was new, plus a restocking charge of at least $200 (or $600 for any mobile POS equipment). In addition, the Merchant agrees to pay Settlor's actual costs and attorneys', accountants' or investigators' fees (if any) plus the greater of: i) the number of remaining months in the Agreement after notice of termination or discontinuation of processing by Merchant, times $35.00 per month; or ii) the number of remaining months in the Agreement after notice of termination or discontinuation of processing by Merchant, times 0.5% the average Visa USA, MasterCard International, and Discover monthly amounts settled to the Operating Account during the prior six months (or, if less than six full months have elapsed, then all previous months' amounts settled to the Operating Account (as defined below); or iii) a flat termination fee of $500.00. Merchant agrees that these damages are not a penalty but are a reasonable computation of the financial harm caused by the termination of this Agreement. Settlor's rights of termination are non-cumulative.




**PAYARC LLC**
**TERMS AND CONDITIONS**

## ARTICLE V – MISCELLANEOUS

5.1 <u>Account Monitoring</u>. Merchant acknowledges that Settlor will monitor Merchant's daily deposit activity. Settlor may upon reasonable grounds suspend disbursement of Merchant's funds for any reasonable period of time required to investigate suspicious or unusual deposit activity. Settlor will make good faith efforts to notify Merchant promptly following suspension. Neither Bank nor ISO is liable to Merchant for any loss, either direct or indirect, which Merchant may attribute to any suspension of funds disbursement.

5.2 <u>Forms</u>. Merchant will use only the forms or modes of transmission of Sales Drafts and Credit Vouchers that are provided or approved in advance by Bank, and Merchant may not use such forms other than in connection with card transactions.

5.3 <u>Indemnification</u>. Merchant will defend, indemnify and hold Bank and ISO and each's respective officers, directors, members, shareholders, partners, employees, agents, subcontractors and representatives harmless from and against any and all fines, penalties, claims, damages, expenses, liabilities or fees of any nature whatsoever, including attorneys' fees and costs ("Damages"), asserted against or incurred by Bank or ISO arising out of, relating to or resulting from, either directly or indirectly: (a) a breach of the security of the system safeguarding Cardholder Information resulting in unauthorized access to Cardholder Information; (b) a breach of any representation, warranty or term of this Agreement, including, but not limited to, the data security provisions by Merchant, or any service provider, subcontractor or agent of Merchant; (c) the negligence, gross negligence or willful misconduct of Merchant in the performance of its obligations under this Agreement, including, but not limited to, the data security provisions; (d) any violation of applicable federal and state laws, rules, regulations and guidance and Card Association rules by Merchant; and (e) all third party claims arising from the foregoing. Notwithstanding the preceding, Merchant is not liable to Bank to the extent that Damages are caused by, related to or arise out of Bank's negligence, gross negligence or willful misconduct, or Bank's breach of this Agreement and Merchant is not liable to ISO to the extent that Damages are caused by, related to or arise out of ISO's negligence, gross negligence or willful misconduct, or ISO's breach of this Agreement. Merchant will promptly reimburse Settlor for any assessments, fines, fees or penalties imposed by the Card Association in connection with this Agreement, including the data security provisions, and authorizes Settlor to deduct any such sums from amounts to be cleared and settled with Merchant.

5.4 <u>Records</u>. In addition to any records Merchant routinely furnishes to Settlor under this Agreement, Merchant will preserve a copy of actual paper Sales Drafts and Credit Vouchers and any written authorization of the Cardholder for at least two years after the date Merchant presents the Transaction to Bank.

5.5 <u>Requests for Copies</u>. Immediately after Merchant receives the request by Settlor, Merchant will provide to Bank either the original or a legible copy (in a size comparable to the actual Sales Draft) of the paper Sales Draft and any other documentary evidence available to Merchant that Settlor reasonably requests to meet Bank's or ISO's obligations under law (including any obligations of Bank under the Fair Credit Billing Act) or otherwise to respond to questions concerning Cardholder accounts.

5.6 <u>Compliance with Law</u>. Merchant will comply with all laws applicable to Merchant, Merchant's business and any Card Transaction, including without limitation all state and federal consumer credit and consumer protection statutes and regulations.

5.7 <u>Fees and Charges</u>. Merchant will pay to Settlor the fees and charges set forth on Schedule A including any additional charges applied to transactions that fail to meet Card Association requirements for the lowest interchange levels. Merchant's Account will be debited through ACH or withheld from daily payments to Merchant for such amounts and for any other fees, charges or adjustments incurred by Merchant and associated with processing services. Settlor may change fees, including adding fees for additional services utilized by Merchant, upon 30 days' written notice to Merchant.

5.8 <u>Merchant Statement</u>. Settlor shall make available a Merchant Statement or similar information on no less than a monthly basis. All information appearing on the Merchant Statement shall be deemed accurate and affirmed by Merchant unless Merchant objects by written notice specifying the particular item in dispute within 30 days of the date of the Merchant Statement. Delivery of the Merchant Statement may be in written or electronic form.

5.9 <u>Security Interest</u>. To secure payment of Merchant's obligations under this Agreement, Merchant grants to Bank and ISO a <u>security</u> interest in all now existing or hereafter acquired: (a) Transactions, Sales Drafts, Credit Vouchers and other items submitted to Settlor for processing by or for Merchant; (b) accounts receivable and payment rights relating to or arising from this Agreement, including all amounts due Merchant (including any rights to receive credits or payments hereunder); (c) accounts (including without limitation all deposit accounts) maintained with the Bank or any institution other than Bank, including the Reserve Account, in the name of or for the benefit of, Merchant or any guarantor of Merchant's obligations under this Agreement; (d) deposits, regardless of source, to Merchant's or any guarantor's accounts with Bank or any institution other than Bank, including the Reserve Account; (e) all deposits and all other property and funds deposited by Merchant or withheld by Settlor, including funds and property withheld as the result of security monitoring; and (f) proceeds of the foregoing. If Settlor reasonably determines that Merchant has breached any obligation under this Agreement, or that proceeds of Merchant's future card sales are unlikely to compensate Settlor for anticipated Chargebacks, credits, fees or fines and adjustments, as reasonably determined by Bank (whether or not this Agreement has been terminated or for any other reason), Settlor may setoff or otherwise exercise the security interest without notice or demand by immediately withdrawing from or freezing any account or otherwise exercising its rights under this Agreement or those rights available under applicable laws, including the California Uniform Commercial Code, or in equity. In addition to the collateral pledged above, Settlor may, in its reasonable discretion, require Merchant to furnish such other and different security as Settlor deems appropriate




**PAYARC LLC**
**TERMS AND CONDITIONS**

in its sole discretion to secure Merchant's obligations under this Agreement. Settlor may fully or partially prohibit withdrawal by Merchant of funds from Merchant's deposit accounts maintained with Bank or financial institutions other than Bank, pending Settlor's determination from time to time to exercise its rights as a secured party against such accounts in partial or full payment of Merchant's obligations to Settlor. Merchant will execute any documents and take any actions required to comply with and perfect any security interest under this paragraph, at Merchant's cost. Merchant represents and warrants that no other party has a security interest or lien in any of the collateral pledged above, and Merchant will obtain Bank and ISO's written consent before it grants a lien or security interest in that pledged collateral to any other person.

5.10  Modifications to Agreement. This Agreement is subject to amendment to conform with Card Association regulations, as amended from time to time. From time to time Settlor may amend any provision or provisions of this Agreement, including, without limitation, those relating to the discount rate or to other fees and charges payable by Merchant by mailing written notice to Merchant of the amendment at least 30 days prior to the effective date of the amendment, and the amendment will become effective unless Bank receives Merchant's notice of termination of this Agreement before such effective date. Amendments required due to changes in either Card Association's rules and regulations or any law or judicial decision may become effective on such shorter period of time as Bank may specify if necessary to comply with the applicable rule, regulation, law or decision.

5.11  Warranty Disclaimer. BANK AND ISO MAKES NO WARRANTIES REGARDING THE USE, OPERATION OR PERFORMANCE OR NON-PERFORMANCE OF SOFTWARE AND SYSTEMS UTILIZED FOR THIS AGREEMENT, WHETHER EXPRESS OR IMPLIED, AND BANK AND ISO EXPRESSLY DISCLAIM ALL IMPLIED WARRANTIES, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

5.12  Limitation of Liability. Bank's liability or ISO's liability with respect to any Card Transaction may not exceed the amount of the Sales Draft in connection with that Transaction less any applicable fees and charges. Bank and ISO are not liable for any incidental or consequential damages whatsoever. Merchant waives all claims against Bank and ISO for any loss, claim, demand, penalty, action, delay, cost or expense (including reasonable attorneys' fees) of any kind unless Merchant provides written notice to Bank and ISO of the occurrence that gave rise to the alleged liability within 30 days after Merchant knew or should have known of the occurrence. Merchant will indemnify and hold Bank and ISO harmless from any claim relating to any Sales Draft paid for by Settlor as may be made by anyone by way of defense, dispute, offset, counterclaim or affirmative action, or for any damages of or losses that Bank or ISO may incur as a result of Merchant's breach of this Agreement. Further, Merchant will reimburse Bank and ISO for all expenses and costs, including attorneys' fees, with regard thereto.

5.13  Waiver. Settlor's failure to enforce one or more of the provisions of this Agreement will not constitute a waiver of the right to enforce the same or other provision in the future.

5.14  Written Notices. All written notices and other written communications required or permitted under this Agreement will be deemed delivered immediately when hand delivered or sent via facsimile and the sender obtains a fax confirmation receipt, and upon mailing when sent first class mail, postage prepaid, addressed as follows:

5.15  If so ISO: PayArc LLC 103 Mason Street, Greenwich CT 06830 Attn. Chief Operating Officer;

5.16  If to Bank: Evolve Bank and Trust, 6070 Poplar Ave, Memphis, TN 38119, Attn: Payment Processing Team

5.17  If to Merchant: At the facsimile number or address provided as the billing address and to the contact listed on the Merchant Application.

5.18  Choice of Law; Jurisdiction. Tennessee law governs this Agreement. Any claim or cause of action by Merchant arising out of this Agreement against Bank must be initiated and maintained exclusively in the state or federal courts located in Memphis, TN.

5.19  Entire Agreement; Assignability. This Agreement expresses the entire understanding of the parties with respect to the subject matter hereof and except as provided herein, may be modified only in writing executed by Bank, ISO, and Merchant. This Agreement may not be assigned, directly or by operation of law, without Bank and ISO's prior written consent. This Agreement will be binding upon and inure to the benefit of the parties' respective heirs, personal representatives, successors and assigns.

5.20  Deposit Account. Merchant will at all times maintain an Account at a bank that is a member of the Federal Reserve ACH system and will provide Settlor with proper authorization to debit the Account (the "Operating Account"). All credits for collected funds and debits for fees, payments and Chargebacks and other amounts for which Merchant is liable under the terms of this Agreement will be made to the Account. Merchant may not close or change the Account without written notice to Settlor. Merchant will be solely liable for all fees and costs associated with the Account and for all overdrafts. Merchant hereby grants to Bank and ISO a security interest in the Account to the extent of any and all fees, payments and Chargebacks and other amounts due which may arise under this Agreement, and Merchant will execute any document and obtain any consents or waivers from the bank at which the Account is maintained as requested by Bank and ISO to protect their security interests therein.

5.21  Credit and Financial Inquiries; Additional Locations; Inspections. Settlor may make, at any time, any credit inquiries which it may consider necessary to accept or review acceptance of this Agreement or investigate Merchant's deposit or Card acceptance activities subsequent to acceptance of this Agreement. Such inquiries may include, but are not limited to, a credit and/or criminal check of the business including its proprietor, partners, principal owners or shareholders or officers. Upon Settlor's request, Merchant will provide the written consent of



**PAYARC LLC**
**TERMS AND CONDITIONS**



any person for which an inquiry has been or is to be made if such person has not executed this Agreement and will provide any financial statements, income tax and business tax returns and other financial information as Settlor may consider necessary to perform initial or periodic reviews of Merchant's financial stability and business practices. Merchant may accept Cards only at locations approved by Bank. Additional locations may be added, subject to Bank's approval. Any party to this Agreement may delete any location by providing notice as provided herein. Merchant will permit Bank, at any time and from time to time, to inspect locations to confirm that Merchant has adhered or is adhering to the terms of this Agreement and is maintaining the proper facilities, equipment, inventory, records and license or permit (where necessary) to conduct its business. However, nothing in this paragraph may be deemed to waive Merchant's obligation to comply in all respects with the terms of this Agreement. Bank, its internal and external auditors, and its regulators may audit compliance with this Agreement, compliance with federal and state laws, rules, regulations and guidance applicable to the services, Card acceptance and Transaction processing, and data security provisions, including Card Association compliance. Merchant will make available its records maintained and produced under this Agreement, and Merchant's facilities will be made accessible, upon notice, during normal business hours for examination and audit. Nothing in this section may be construed to require Merchant to give access to its facilities, personnel or records in a manner that unreasonably interferes with its business operations. Each party will bear its expenses of any audit.

5.22  <u>Marketing of Non-Bankcard Services by ISO</u>. From time to time, ISO may offer to Merchant certain additional products and services which may or may not be related to the processing of credit card Transactions. In the event of such offers, Merchant shall indicate its desire to ISO to decline such offers or be deemed to have accepted the offers and be liable for payment therefore. Bank shall have no responsibility or liability to Merchant for performance of such non-credit card transaction services if provided by ISO or a third party, and ISO and Merchant shall enter separate agreements pertaining to such services, if any.

5.23  <u>Force Majeure</u>. The parties will be released from liability hereunder if they fail to perform any obligation where the failure occurs by reason of any act of God, fire, flood, storm, earthquake, tidal wave, communications failure, sabotage, war, military operation, terrorism, national emergency, mechanical or electronic breakdown, civil commotion or the order, requisition, request or recommendation of any governmental authority, or either party's compliance therewith, or governmental regulation, or priority, or any other similar cause beyond either party's reasonable control.

5.24  <u>No Third Party Beneficiary</u>. No other person or entity may be deemed to be a third party beneficiary of this Agreement.